

# NUMBER 13-22-00107-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

BRYAN ALBERTO CALDERON,                                    Appellant,

v.

THE STATE OF TEXAS,                                         Appellee.

### On appeal from the 332nd District Court
### of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Justices Benavides, Tijerina, and Peña
### Memorandum Opinion by Justice Benavides

Appellant Bryan Alberto Calderon appeals from the trial court's judgment adjudicating him guilty of the offense of aggravated sexual assault of a child, a first-degree felony, and sentencing him to thirty years' imprisonment. *See* Tex. Penal Code Ann. § 22.021(a)(2)(B). By six issues that we have reorganized as three issues, Calderon claims the trial court erred because: (1) there was insufficient evidence to support a

finding that Calderon violated the terms of his community supervision; (2) adjudicating him guilty for disobeying a rule of the Hidalgo County Community Supervision and Corrections Department (CSD) violated the due process clause of the United States Constitution and the due course of law clause of the Texas Constitution, *see* U.S. CONST. amend. XIV; TEX. CONST. art. 1, § 19; and (3) the trial court failed to take Calderon's mental health into account as a mitigating factor when sentencing him. We affirm.

## I.    BACKGROUND

On July 20, 2015, the trial court deferred an adjudication of guilt and placed Calderon on community supervision for the above-described offense. As part of the terms of his community supervision, Calderon was required to, among other things, (1) "[c]ommit no offense against the laws of this State, or of any other State, or the United States," and (2) "[o]bey all rules and regulations of the [CSD]."

After filing two prior motions, the State filed its second amended motion to adjudicate guilt on December 1, 2021. In this motion, the State alleged that Calderon violated the terms of his community supervision by, among other things, (1) committing the criminal offense of harassment on May 14, 2020; (2) failing to obey CSD's rules and regulations by threatening a probation officer on May 14, 2020; and (3) failing to obey CSD's rules and regulations by conveying threatening comments about a probation officer on July 9, 2021.

A hearing on the State's second amended motion to adjudicate initially commenced on December 1, 2021. However, shortly after the State began questioning its first witness, Calderon discovered that the State was proceeding on its second

2

amended motion, which was filed that same day, rather than its first amended motion, which was filed June 29, 2020. The trial court granted a continuance so that Calderon could familiarize himself with the State's additional allegation pertaining to the July 9, 2021 incident, and the hearing resumed on December 13, 2021.

Sarah Cervantes, a probation officer assigned to CSD's sex offender unit, testified at the hearing. Cervantes explained that as part of her duties she "discuss[es] compliance [with] . . . sex offender registration requirements, conduct[s] home visits, make[s] family contact, [and has] face-to-face contact with the offenders to gather information."

According to Cervantes, she began supervising Calderon on July 27, 2015. Cervantes testified to several incidents that occurred over the course of her supervision. On August 4, 2015, Cervantes discovered that Calderon was working at a funeral home that was "one or two businesses right next door" to a daycare. Cervantes notified Calderon's employer that this was a violation of Calderon's probation, and the employer informed Cervantes that Calderon would not be permitted to continue working at that location. Cervantes testified that she then conducted a home visit with Calderon. A sheriff's deputy accompanied her on this visit. When she notified Calderon about the change in his employment, Calderon "became extremely belligerent[,] . . . expressed a lot of anger[,] and attempted to charge towards [Cervantes]." The sheriff's deputy was able to restrain him.

During a July 2017 visit, Calderon reportedly asked Cervantes for permission to travel out of state for an entire month for a job opportunity. When Cervantes denied him permission, Calderon "cause[d] a scene." Cervantes recounted that he "broke an

umbrella, and he threw it at a trash can," "he started begging [Cervantes] and he got on his knees," and he was "crawling on his knees . . . in front of everybody."

On May 13, 2020, Cervantes ran into Calderon at a local gas station. According to Cervantes,

[T]he only thing I said to him was, hi, [Calderon].

And then he—he walked right past me in a very rude manner. He just like told me real loud like, I don't have time for you, Mrs. Cervantes. . . . [H]e didn't want to like have contact, so that's fine.

So I—I remained there and then eventually he came back. He didn't—he didn't put gas [in] or anything. He just left.

But as he was leaving, he left very erratic like the way he was driving was almost losing control . . . .

And so I didn't know what to do so I had remained in the car and I contacted his mother. And I told her that she needs to talk to [Calderon] because the way he was driving the vehicle was like—like a very aggressive manner, you know.

The following day, Calderon was required to report to Cervantes by making a phone call. Cervantes's notes pertaining to the May 14, 2020 call were admitted into evidence and read, in part, as follows:

On 5-14-20, Defendant[1] failed to call the office to report. CSO[2] placed [a] phone call [to] Defendant's mother's phone . . . . CSO asked to speak to Defendant. Defendant came to the phone and was immediately upset at the fact that CSO was calling. Defendant said he didn't really want to talk to CSO and that he didn't have time for the phone conversation. CSO reminded Def that he was acting the same way yesterday 5-13-20 when CSO had seen him at the gas station. Defendant said he didn't really have time to talk to CSO yesterday nor today. Def became rude on the phone saying[,] "What do you want Mrs. Cervantes, tell me what you want, I'm waiting[.]" Defendant was reminded that he was supposed to call P.O. this

---

[1] "Defendant" and "Def" refer to Calderon.

[2] "CSO" and "P.O." refer to Cervantes.

morning around 10:30 AM and it was already past 11:00 AM. CSO explained to Def that CSO was taking the initiative to call him for the report. Defendant then went on saying, "Why did you have to call my mother yesterday, you don't have the right to be calling her to snitch on me[.]"[ ]Def was [told] that CSO can call his mother and any other person listed on the contacts list if I need to inquire about him. Defendant start[ed] saying[,] "I'm so sick and tired of you[,] Mrs. Cervantes[,] and everyone else telling me what to do, I no longer care about anything." CSO explained to Def[ ]that he cannot go on speaking rude [sic] like that. Def said[,] "Yes[,] I can, I can speak to you how ever [sic] the heck I want, because I have rights and as a U.S. citizen of the United States I have constitutional rights that protect me[.]" Defendant continues saying[,] "I have the right to the First Amendment so I can speak and say what I want and I also have the right to bear arms under the Constitution." Defendant then asked CSO a direct question. Def said[,] "Let me ask you this[,] Mrs. Cervantes[,] do you want your kids to have a future?[ ]Answer me that question[,]" and the Defendant made reference to the question twice asking once again[,] "So answer me Mrs. Cervantes, so do you want to see your kids have a future?" CSO replied to Defendant "Yes[,] I want my kids to have a good future, but my kids have nothing to do with our conversation[.]" CSO [told] Defendant to calm down and to take a deep breathe [sic] and to concentrate on our conversation. Defendant was having a hard time holding himself as if he was sighing with anger and continued catching his breath. Def said "Mrs. Cervantes, I'm giving you a chance to stop calling me or questioning me, you need to stop it already[.]"[ ]"I'm sick and tired of having to deal with you and everyone else.[ ]Why did you call me Mrs. Cervantes, what's the purpose of your call, hurry and tell me what you want[.]" CSO explained to Def that I was calling to take his report for the month of May and because he didn't call and so I was wondering if everything was okay. CSO advised Def that he cannot continue speaking to CSO in that tone and expect not to be addressed as wrong. Def again would sigh and in a strong voice was saying "I'm giving you a last chance Mrs. Cervantes, if you don't stop I will start taking action and I know what to do and where to find you and your husband and I can take pictures."[3]

During her testimony, Cervantes provided additional details concerning the phone call, including that Calderon "was yelling . . . very loud. Like not simply just telling me. He was screaming . . . on the phone." She also stated that she "asked him, are you

_____

3 The quoted language has been modified from all capital letters.

5

threatening me[?] And then he said I have the right to bear arms, you know, he referred back to that."

Shortly after this incident, Calderon was arrested on the State's motion to revoke. He was later charged with harassment, as well. *See* TEX. PENAL CODE ANN. § 42.07. A new probation officer, Fernando Anzaldua, was assigned to monitor Calderon's progress. According to Anzaldua, on June 29, 2021, he visited Calderon in jail. During that visit, Calderon relayed to Anzaldua that he was remorseful for his actions and wished to relay an apology through Anzaldua to Cervantes. However, later, on July 9, 2021, Calderon stated that his "mom's blood is on Mrs. Cervantes'[s] hands" because his mother passed away shortly after Calderon was arrested. Anzaldua stated that Calderon "seemed a little angry" while making this comment.

Calderon testified in his own defense. According to Calderon, during the May 14, 2020 phone call, he was discussing the panoply of rights he enjoyed as a U.S. citizen, including his right to bear arms, to make "small talk" since it was "voting season." However, he also testified that he understood why Cervantes would feel threatened by his statements. Calderon stated that he was "sorry that he said such a thing," but that "at the spur of the moment, [he] didn't know what else to say or who to blame."

The trial court found true the violations described above. The trial court adjudicated Calderon guilty for the offense of aggravated sexual assault of a child and sentenced him to thirty years in prison. This appeal followed. The State has not filed a brief to aid the Court in our disposition.

6

## II.    SUFFICIENCY OF THE EVIDENCE

By his first issue, Calderon argues that the evidence is insufficient to show he violated the conditions of his community supervision. Specifically, Calderon argues that the evidence does not show that he threatened Cervantes or that he possessed the necessary *mens rea*.

### A.    Standard of Review

Our review of an order revoking probation is limited to determining whether the trial court abused its discretion. *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). A trial court abuses its discretion only when its decision "was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992). We examine the record in the light most favorable to the trial court's ruling. *Jones v. State*, 112 S.W.3d 266, 268 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.).

Proof of a single violation is sufficient to support an order of revocation. *Garcia v. State*, 387 S.W.3d 20, 26 (Tex. Crim. App. 2012). "To convict a defendant of a crime, the State must prove guilt beyond a reasonable doubt, but to revoke probation (whether it be regular probation or deferred adjudication), the State need prove the violation of a condition of probation only by a preponderance of the evidence." *Hacker v. State*, 389 S.W.3d 860, 864–65 (Tex. Crim. App. 2013). In other words, the State need only show that the greater weight of the evidence creates a reasonable belief that the defendant has violated a condition of his probation. *Rickels v. State*, 202 S.W.3d 759, 763–64 (Tex. Crim. App. 2006).

**B.    Analysis**

We first address the sufficiency of the evidence to prove Calderon committed an offense against the state of Texas—namely, harassment—as our analysis of this violation is dispositive of this and other issues. To prove that Calderon committed this offense, the State was required to show by a preponderance of the evidence that Calderon: (1) "threaten[ed], in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person, a member of the person's family or household, or the person's property," and (2) that he did so "with [the] intent to harass, annoy, alarm, abuse, torment, or embarrass another." *See* TEX. PENAL CODE ANN. § 42.07(a)(2).

"Comments can be evaluated as threats based, not just on the language used, but also the context within which they are uttered, even veiled threats." *Meyer v. State*, 366 S.W.3d 728, 731 (Tex. App.—Texarkana 2012, no pet.); *see Manemann v. State*, 878 S.W.2d 334, 337 (Tex. App.—Austin 1994, pet. ref'd). The ability to carry out the threat "is not an essential element of the offense." *Manemann*, 878 S.W.2d at 337; *see* TEX. PENAL CODE ANN. § 42.07(a)(2). Conditioning a threat on some action or inaction on the part of the victim does not necessarily obfuscate the nature of the threat. *See Williams v. State*, 194 S.W.3d 568, 572 (Tex. App.—Houston [14th Dist.] 2006 ) (holding evidence was sufficient to sustain conviction for terroristic threat where appellant threatened to "whip" the victim if the victim ever spoke to appellant's child again), *aff'd*, 252 S.W.3d 353 (Tex. Crim. App. 2008); *see also Trehern v. State*, No. 03-97-00600-CR, 1998 WL 766736, at *5 (Tex. App.—Austin Nov. 5, 1996, no pet.) (mem. op., not designated for

8

publication) (holding evidence sufficient to support conviction for harassment where appellant called and threatened to shoot the victim if the victim "did not reveal the location of appellant's family").

As illustrated above, Cervantes and Calderon had a tumultuous history. According to Cervantes, during the May 14, 2020 call, Calderon brought up his second amendment right to bear arms seemingly apropos of nothing. He then proceeded to ask her multiple times whether she wanted her children to have a future and whether she wanted to "see" her children have a future. Calderon also told her that if she did not stop calling, he would "start taking action," that he knew "what [to] do and where to find [Cervantes] and [her] husband," and that he "can take pictures." When Cervantes asked whether he was threatening her, instead of denying it, he again brought up his right to bear arms. In viewing this evidence in the light most favorable to the trial court, we conclude that it was sufficient to prove by a preponderance of the evidence that Calderon threatened, in a manner reasonably likely to alarm Cervantes, to inflict bodily injury on Cervantes and her family members. *See* TEX. PENAL CODE ANN. § 42.07(a)(2); TEX. FAM. CODE ANN. § 71.003 (defining "family"); *Manemann*, 878 S.W.2d at 337 ("Threats of physical harm need not be directly expressed, but may be contained in veiled statements nonetheless implying injury to the recipient when viewed in all the circumstances."); *see also Holbrooks v. State*, No. 03-10-00141-CR, 2012 WL 2077340, at *4 (Tex. App.—Austin June 6, 2012, no pet.) (mem. op., not designated for publication) (holding that appellant's statements during a phone call that included "You better watch your back"; "You gonna get it"; and "I'm going to [expletive] you up" were sufficient evidence of harassment under § 42.07(a)(2)).

9

We now turn to the *mens rea* element of the alleged offense. To prove that a defendant acted with the requisite intent, "the State may rely upon the circumstances surrounding a defendant's actions." *Wilson v. State*, 448 S.W.3d 418, 424 (Tex. Crim. App. 2014) (plurality op.). As the Third Court of Appeals pointed out in *Manemann*, the context in which threats are made is also important to discerning their intended meaning. 878 S.W.2d at 338. The tone in which a communication is made and the person to whom it is made thus provide some insight into the communicator's intent. *See id.*; *Wilson*, 448 S.W.3d at 424.

Calderon testified that his comments were misconstrued. Rather than attempting to threaten Cervantes, he claimed he was merely engaging in small talk about his rights since the May 14, 2020 call took place during "voting season." However, he also conceded that he understood why Cervantes felt threatened by his comments. He further testified that "[t]o this day, I am sorry that I said such a thing." *See Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi–Edinburg 1993, pet. ref'd) ("A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt."); *see also Melendez v. State*, No. 13-12-00557-CR, 2013 WL 3377465, at *2 (Tex. App.— Corpus Christi–Edinburg July 3, 2013, pet. ref'd) (mem. op., not designated for publication).

According to Cervantes, when Calderon delivered the May 2020 remarks, he "was yelling . . . very loud. Like not simply just telling me. He was screaming . . . on the phone." And as Cervantes pointed out in her notes and in her testimony, the topic of her children's future was not relevant to the purpose of the call, which was to ensure that Calderon

reported for the month of May. *See Manneman*, 878 S.W.2d at 338; *cf. Wilson*, 448 S.W.3d at 425 ("Benign content does not always prove benign intent, nor the objective harmlessness of its delivery."). Thus, we conclude that the evidence was also sufficient to show that Calderon intended to threaten Cervantes when he brought up his right to bear arms and then yelled, "[D]o you want to see your kids have a future?" *See* TEX. PENAL CODE ANN. § 42.07(a)(2).

We overrule Calderon's first issue.[4]

### III. MENTAL HEALTH AS A MITIGATING FACTOR

In his final issue, Calderon asserts that the trial court erred by failing to consider his mental health as a mitigating factor in assessing his punishment. In discussing this issue, Calderon suggests that the trial court's error was an abuse of discretion but does not cite to any authority that confirms this is the standard by which we should measure the trial court's actions. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for contentions made, with appropriate citations to authorities and to the record."). Further, Calderon cites no authority for the proposition that it was error for the trial court to not consider mitigating factors when sentencing him. *See id.*

Even if we were to conclude that this issue was adequately briefed, Calderon did

---

[4] Because we conclude that the evidence was sufficient to prove by a preponderance of the evidence that Calderon harassed Cervantes, we need not address the sufficiency of the evidence to support the two other violations the trial court found—that Calderon failed to obey CSD's rules by conveying threatening comments on two separate occasions. *See Garcia v. State*, 387 S.W.3d 20, 26 (Tex. Crim. App. 2012). Further, because we need not address the sufficiency of the evidence to support these two other violations, we also need not address Calderon's argument that revoking his probation because he failed to obey CSD's rules violated his due process rights. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). Calderon does not challenge the constitutionality of the violation we have analyzed. Thus, we overrule Calderon's second issue.

not object below on the grounds that the trial court failed to take his mental health into consideration when sentencing him. *See id.* R. 33.1(a) (discussing how error is preserved). Nor did he object on the grounds that his sentence was excessive. *See id.* And Calderon does not argue on appeal that the trial court ran afoul of a systemic requirement or prohibition or that it violated a waivable-only right when it sentenced him. *See Rios v. State*, No. PD-0441-21, 2022 WL 17481021, at *7 (Tex. Crim. App. Dec. 7, 2022); *Marin v. State*, 851 S.W.2d 275, 279–80 (Tex. Crim. App. 1993). We therefore conclude that this issue was not adequately preserved for our review.

## IV. CONCLUSION

We affirm the trial court's judgment.


GINA M. BENAVIDES
Justice


Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
23rd day of February, 2023.

12